**NORTH AVENUE NOVELTIES, INCORPORATED, Plaintiff–Appellant,**

v.

**CITY OF CHICAGO, an Illinois municipal corporation, Defendant–Appellee.**

**No. 95–2474.**

United States Court of Appeals, Seventh Circuit.

Argued May 17, 1996.

Decided July 1, 1996.

Rehearing Denied July 18, 1996.

Michael Null, Reed Lee (argued), and Deidre Baumann, Null & Associates, Chicago, IL, for North Avenue Novelties, Inc.

Lawrence Rosenthal, Benna R. Solomon, Anita K. Modak–Truran, Kenneth L. Schmetterer (argued), and Susan S. Sher, Office of Corporation Counsel, Appeals Division, Chicago, IL, for City of Chicago.

Before CUMMINGS, BAUER and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff North Avenue Novelties, Inc. ("Novelties") seeks a declaratory judgment that the provisions of the Chicago Zoning Ordinance specifying the location of "adult uses" in Chicago are unconstitutional. For the following reasons, we affirm the district court's conclusion that the ordinance is not unconstitutional.

## I.

It is helpful to begin by examining the overall scheme of the Chicago Zoning Ordinance. Decades ago, the City of Chicago was divided into Residential Districts, Business Districts, Commercial Districts, and Manufacturing Districts. The ordinance was subsequently amended to create a fifth type: Planned Manufacturing Districts ("PMDs"). Like any zoning scheme, the purpose of these divisions was to ensure conformity in the types of buildings and activities that comprise each area, and to achieve this result the Chicago Municipal Code outlines the specific "permitted uses" and "special uses" for each district. Any use that is not specifically listed is prohibited. See *Williams v. City of*

*Bloomington,* 108 Ill.App.2d 307, 311, 247 N.E.2d 446, 449 (4th Dist.1969).

In 1992, the City of Chicago amended the Zoning Ordinance to limit the location of "adult uses." It did so in two ways. First, it designated adult uses as "special uses" only for Commercial and Manufacturing Districts.[1] Second, it dictated that adult uses are only permitted if they are located at least 1,000 feet from (a) any existing adult use; (b) any existing school or place of worship; and (c) any district zoned for residential use. *Chicago, Ill. Municipal Code* §§ 17–9.3–2(B)(6) & 17–9.3–3(A)(4) (1992).

Novelties opened its bookstore in 1992 at 1308 W. North Avenue in Chicago. Given the sexual character of its products, the bookstore easily qualified as an "adult use" under the ordinance. However, the bookstore's location is such that it fails both adult use requirements. It is not within a Commercial or Manufacturing District, but is located in a PMD known as the "Elston Corridor PMD." And, it is only 825 feet from a Residential District. Thus Novelties is precluded from operating the bookstore at its current location.

## II.

As in any case, we must initially determine whether this dispute is properly before us. Although the district court concluded that the adult use provisions of the Chicago Zoning Ordinance were not unconstitutional, it initially held that Novelties lacked standing to assert its claim. This conclusion was based upon the fact that commercial and retail businesses—adult or otherwise—are not permitted to operate in PMD areas. See *Chicago, Ill. Municipal Code* §§ 17, Part F, ch. 10.3–1 (permitted uses) & 10.4–1 (special uses).[2] As a result, the court decided that a determination that the specific adult use provisions were unconstitutional would not change Novelties' position because the provisions prohibiting commercial operations in PMDs would still preclude the bookstore's operation.

We recently addressed a similar situation in *Harp Advertising Illinois v. Village of Chicago Ridge,* Ill., 9 F.3d 1290 (7th Cir. 1993). In *Harp,* an advertising company wanted to erect a billboard in Chicago Ridge, Illinois, but the village's zoning code prohibited all off-premises signs. The company brought suit alleging that the zoning code violated the First Amendment. That code was not the only ordinance in play, however, for the village's sign code prohibited all signs with faces exceeding 200 square feet, which the plaintiff's sign did. Because the plaintiff did not contest the validity of the sign ordinance, we held that it had no standing to challenge the zoning ordinance. We noted that one of the essential elements of standing is redressability: a favorable decision of the court must redress the plaintiff's injury. *Id.* at 1292 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–560, 112 S.Ct. 2130, 2135–36, 119 L.Ed.2d 351). Holding that the zoning ordinance was unconstitutional would not have changed the plaintiff's position because its sign would still have been precluded by another, valid, existing ordinance.

*Harp* is similar to our case in that another zoning provision also precludes adult bookstores in Novelties' area: The ordinance prohibits all commercial activity, without regard to sexually explicit nature, in PMD areas. Thus the court below was correct that if one were to simply delete the adult use provisions from the ordinance, the PMD provisions would still remain to preclude Novelties' operation. However, the distinguishing factor between our case and *Harp* is that, unlike the plaintiff in *Harp,* Novelties challenges the PMD provisions of the ordinance as well as the adult use provisions, although admittedly it didn't spell this out in its complaint as clearly as it could have.

---

1. Originally, adult uses were only "special uses" in General Commercial Districts (C2–1 to C2–5) and Commercial–Manufacturing Districts (C3–1 to C3–7). However, amendments in 1993 and 1994 expanded the area to encompass all Commercial Districts and Manufacturing Districts.

2. The regulations for the Elston Corridor PMD are the same as those governing an M1–3 Restricted Manufacturing District. However, despite this fact, adult uses are not permitted anywhere within the PMD because the amendment that allowed adult uses in M1–3 districts specifically stated that it did not apply to PMDs.

Novelties concedes that the City of Chicago is lawfully permitted under its police power to prohibit commercial and retail operations in areas, like the area here, that have been designated only for manufacturing and industrial business. See *Cosmopolitan Nat'l Bank v. County of Cook,* 103 Ill.2d 302, 310, 82 Ill.Dec. 649, 653, 469 N.E.2d 183, 187 (1984). However, Novelties challenges Chicago's overall scheme of limiting adult uses to certain specified areas. In essence, this is a facial attack on the ordinance because Novelties alleges that it unconstitutionally limits the total amount of sexually explicit speech. In making this challenge, Novelties necessarily contends that the PMD provisions contribute to the overall speech restriction. One must only set forth in a complaint a "short and plain statement of the claim" in federal court, Fed.R.Civ.P. 8(a)(2), and "unlike insurance contracts, complaints are construed favorably to their drafters." *Hrubec v. National R.R. Passenger Corp.,* 981 F.2d 962, 963 (7th Cir.1992). It would make little sense to read Novelties' complaint so strictly that it had fully conceded that some provisions of Chicago's Zoning Ordinance could preclude its operation such that it had no case. We conclude that we have jurisdiction to resolve Novelties' claim.

### III.

Many municipalities have attempted to lessen the "secondary effects" of adult establishments by controlling their locations. The Chicago Zoning Ordinance is typical in this regard: It does not prohibit sexually explicit expression, but merely requires that such expression take place only in specified areas, and only in a non-concentrated manner. Such restrictions are viewed as content-neutral "time, place, and manner regulations," and are constitutional so long as they are "designed to serve a substantial government interest and do not unreasonably limit alternative avenues of communication." *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50, 106 S.Ct. 925, 930, 89 L.Ed.2d 29. As with any restriction on speech, the government bears the burden of justifying the regulation. See, *e.g., Board of Trustees of State University of New York v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3034–35, 106 L.Ed.2d

388; *City of Watseka v. Illinois Pub. Action Council,* 796 F.2d 1547, 1552 (7th Cir.1986), aff'd, 479 U.S. 1048, 107 S.Ct. 919, 93 L.Ed.2d 972.

Novelties does not disagree with the City of Chicago's substantial interest in regulating the location of sexually explicit materials; it contends only that the ordinance fails to leave open sufficient alternate communication avenues. It recognizes that the Supreme Court has previously upheld very similar zoning schemes: One which dispersed adult uses by requiring that they be 1,000 feet from each other, see *Young v. American Mini Theatres,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310, and one that concentrated them by requiring that they be 1,000 feet from residential areas, schools, and places of worship, see *Renton, supra.* Novelties contends, however, that while both of these schemes may have been constitutional in their respective cities, the Chicago Zoning Ordinance violates the First Amendment by merging the strategies and applying them to Chicago. We agree that the holdings of *Young* and *Renton* cannot merely be "combined" to conclude that the Chicago zoning scheme is necessarily constitutional; instead the scheme, as it is applied to Chicago's geographic area, must be considered.

In *Young,* the plurality focused on the fact that the ordinance at issue did not "deny [distributors of sexually explicit materials] access to the market or [render] the viewing public ... unable to satisfy its appetite for sexually explicit fare." *Young,* 427 U.S. at 62, 96 S.Ct. at 2448. Justice Powell agreed and stated that the "primary concern of the free speech guarantee is that there be full opportunity for expression in all its varied forms to convey a desired message [and] that there be full opportunity for everyone to receive the message." *Id.* at 76, 96 S.Ct. at 2455 (J. Powell, concurring). Thus in analyzing Chicago's scheme, it is necessary to focus both on the ability of producers as a group to provide sexually explicit expression, as well as on the ability of the public as a whole to receive it.

Both parties used experts to evaluate the available locations for adult uses under the

ordinance. Edwin Thomas, a professor of quantitative geography, testified for Novelties, and Thomas Smith, Director of Planning and Development, testified for Chicago. Using the most expansive definition of "school" and "place of worship" possible, Professor Thomas concluded that the zoning ordinance left available roughly 270 acres, in various locations, or less than one percent of the land within Chicago's city limits. Mr. Smith's calculations led to figures for land available for adult use ranging from one percent to three percent. Novelties' entire argument rests upon comparing Thomas' figures with the figures relating to the ordinances at issue in other adult use zoning cases. It notes that the Chicago figures represent smaller acreage than that in Renton, Washington: Chicago would have to set aside for adult uses 5 percent of its land to be equivalent based on total acreage, or make 16,602 acres available to be equivalent based on population. See *Renton, supra.* And to equal the percentages of available land in Los Angeles, Chicago would need to provide roughly 3,637 acres (compared by land) or 5,943 acres (compared by population) for adult uses. See *Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524 (9th Cir.1993) (affirming grant of preliminary injunction against ordinance's application to adult uses). Because Chicago's ordinance sets aside a lesser amount of space for adult uses than other cities, argues Novelties, its scheme is unconstitutional.

The district court properly dismissed these comparisons by noting that the amount of acreage, standing alone, is largely irrelevant. The constitution does not mandate that any minimum percentage of land be made available for certain types of speech. What it does require is that zoning schemes that regulate the location of speech provide a "reasonable opportunity" to disseminate the speech at issue. *Renton,* 475 U.S. at 52, 106 S.Ct. at 931; *Young,* 427 U.S. at 71, 96 S.Ct. at 2452–53. Requiring a "reasonable opportunity" in each region can, and most likely does, result in vastly different acreage percentages. But those differences in no way imply that the regions with lower percentages are acting unconstitutionally.

With "reasonable opportunity" as the proper focus, the relevant evidence was as follows: There are currently 35 adult uses within Chicago's city limits. Thomas testified that "numerous" adult use sites were available when Novelties opened for business. He further testified that between 22 and 56 locations (depending upon precisely where adult uses would actually open) are available for new adult uses. The Chicago Zoning Administrator testified that his office receives only about 4 or 5 inquiries per year concerning possible adult use locations. There was no evidence that any person has attempted to open an adult use, but was prevented from doing so by Chicago's ordinance. From this it is clear that the zoning scheme has not lessened the ability of producers of sexually explicit materials to find legal locations throughout Chicago to sell their product. Moreover, there is no indication that the Chicago population is having any difficulty receiving this product. Therefore, the Chicago Zoning Ordinance provides for sufficient alternate channels of communication for sexually explicit materials and is not unconstitutional.

IV.

For the foregoing reasons, the district court's judgment is affirmed.