D.H.L. ASSOCIATES, INC., Plaintiff,

v.

John O'GORMAN, Robert Wallace, Warren Allgrove, Jr., and Eileen Farrell, Individually and in their Capacity as the Tyngsborough Board of Selectmen, and as the Licensing Board for the Town of Tyngsborough, and the Town of Tyngsborough, Defendants.

No. CIV. A. 94–12328–REK.

United States District Court,
D. Massachusetts.

May 7, 1998.

Thomas Lesser, William Newman, Lesser, Newman, Souweine & Nasser, Northampton, MA, for D.H.L. Associates, Inc., Plaintiffs.

Joyce F. Frank, Jonathon M. Silverstein, Richard P. Bowen, Kopelman and Paige, P.C., Boston, MA, for John O'Gorman, Robert Wallace, Warren Allgrove, Eileen Farrell, Tyngsborough, the City of, Tyngsborough Board of Selectmen, Licensing Board for the Town of Selectmen, Defendants.

## Opinion

KEETON, District Judge.

A key characteristic of this case is that it involves interests of parties to the case that applicable law recognizes as interests deserving special protection.

Plaintiffs invoke the law's special protections for interests in freedom of expression and association, for which the applicable legal protections exist not only in the First Amendment of the Constitution and laws of the United States but also in state law that in some instances provides protections beyond those arising under the First Amendment, federal statutes, and federal-law precedents. Defendants invoke the law's special protections for interests of a local community and its citizens in (among other things identified in later Parts of this Opinion) community and citizen choices about how, when, and in what circumstances and ways children receive education about human sexuality, sexual orientation, and explicitly sexual practices in places that are open to the public.

This opinion begins with a statement of background facts, mostly undisputed, in Part I. Part II identifies commercial and economic interests and issues arising from various ways in which they may be relevant to the federal-law claims in this case. Part III begins with a brief statement of conclusions of law that I have reached with respect to authoritative guidelines for decision in a case such as this. Immediately following that brief statement of conclusions is an explanation of the analysis and reasoning that have led me to conclusions about the appropriate legal tests to be applied.

Part IV concerns plaintiff's claim for declaratory judgment and issues of federalism that bear upon allocating authority among federal courts, on the one hand, and state and local institutions and agencies, on the other hand. These issues may have to be considered if plaintiffs do not show a preemptive entitlement to the relief they claim under the Constitution and laws of the United States.

The remaining Parts of the Opinion treat other issues that must be resolved to reach an outcome in this case, and other issues that might be decisive should a higher court take a different view of one or more of the matters I have thought decisive.

### I. Background

The Town of Tyngsborough is located 40 miles from Boston on the border of New Hampshire. Tyngsborough's population is approximately 9,500 people. The Board of

Selectmen sets town policy, and also acts as the town licensing authority with respect to alcoholic beverage ("pouring") and entertainment licenses.

In 1987, the Town of Tyngsborough, by Town Meeting, adopted a B–4 zone that the zoning ordinance declared would allow adult entertainment. The official zoning map (plaintiff's Exhibit No. 2) in effect at that time, however, and in effect until 1994, did not contain any parcel zoned B–4. As John O'Gorman, Chairman of the Board of Selectmen, testified, the 1987 B–4 zone was a "phantom zone."

In July, 1992, DHL Associates, Inc. applied for and the Board of Selectmen issued alcoholic beverage and live entertainment licences for the restaurant then-called "Bogie's" located at 350 Middlesex Road in Tyngsborough. In late January, 1994, DHL advertised the fact that it would be presenting nude dancing beginning on February 10, 1994, at the 350 Middlesex Road location. On February 24, 1994, the Town of Tyngsborough notified DHL that offering nude dancing was in violation of its entertainment licence. As a result, the Town suspended DHL's alcoholic beverage license for a two-day period. Although DHL has continued to offer nude dancing entertainment, the Town has not taken any further action against DHL, according to the testimony of John O'Gorman, because of this pending litigation.

DHL was not the only establishment that began offering live nude dancing entertainment in Tyngsborough in February, 1994. The advertisement of the prospective nude dancing entertainment caused concerned citizens to call their Selectmen. In response, the Selectmen asked the Town Administrator to research the issue of adult entertainment, and the Board held an open Town Meeting on February 14, 1994, to discuss adult entertainment in Tyngsborough. Seventy-five citizens attended the February 14, 1994 open Town Meeting.

Also at the February 14, 1994 Town Meeting, the Selectmen were presented with a Petition for a Special Town Meeting (plaintiff's Exhibit No. 28) to consider adopting Mass. Gen. L. ch. 138, § 12B prohibiting establishments that hold alcoholic beverage licenses from offering any form of nude entertainment. The Petition contained the signatures of over 650 registered Tyngsborough voters. So long as a Petition contains more than 200 such signatures, the Selectmen are obligated to hold a Special Town Meeting.

Once the Town Administrator verified that the required number of qualified signatures appeared on the petition, Articles and a Warrant for a Town Meeting were prepared. In this instance, at a regularly scheduled meeting of the Board of Selectmen on March 7, 1994, the Selectmen signed the Warrant. At that same March 7, 1994 meeting, DHL applied to amend its entertainment license in order to offer nude dancing entertainment at the 350 Middlesex Road location then (and now) called "Matthew's," though some of its patrons still called it "Bogie's." The Board of Selectmen delayed acting on the license application.

On March 28, 1994, the Board of Selectmen, acting as the licensing authority, held a hearing on DHL's application to amend its license. The Selectmen delayed decision rather than voting on the application that night.

The next evening, March 29, 1994, the Special Town Meeting was conducted, at which four Articles relating to adult entertainment were presented to the voters. One of those Articles concerned re-zoning nine parcels, comprising 27 acres, as the B–4 zone to allow for adult entertainment. Voter opposition to the nine parcel proposal was apparent. Walter Eriksen, a private citizen and real estate developer, proposed re-zoning the closed town landfill as the B–4 zone. John O'Gorman moved to amend the Article so that only two parcels, a 4.41 and a 3.47 acre tract, would be placed in the B–4 zone. The Town Meeting unanimously adopted the amended Article and the other three Articles in their original form.

Although the tracts re-zoned B–4 were located in an industrial zone, the tracts were in close proximity to residences and to the Notre Dame School. The 4.41 acre lot, at the time of the re-zoning, and today, is occupied by a commercial self-storage business called Dover Storage.

After the Special Town Meeting and after a second hearing on DHL's application to amend its entertainment license, the Selectmen denied DHL's application, and the reason given, albeit belatedly, was that DHL was not located in the B–4 zone. In December of each year since, the Board of Selectmen have granted DHL an entertainment license that does not allow nude dancing.

On May 21, 1996, the Town of Tyngsborough, by a Town Meeting, eliminated the 1994 B–4 zone and established a new B–4 zone on Cummings Road. The 1996 B–4 zone was located on property owned or then under contract for sale to Applewood Construction, which in turn is owned by Walter Eriksen. Applewood Construction is developing an industrial park that will include five lots zoned B–4.

In 1994, seeking relief in a judicial forum, DHL Associates, Inc. filed a case in Middlesex Superior Court. The original complaint sought declaratory relief on federal and state constitutional grounds, as well as damages against the Board of Selectmen. The defendants in the case removed the case to this court (Docket No. 1, filed November 22, 1994). As a result of the decision in *Bogan v. Scott–Harris*, —— U.S. ——, 118 S.Ct. 966, —— L.Ed.2d—— (1998), plaintiff's claims with respect to the legislative activities of the Board of Selectmen became unsupportable. Plaintiff's remaining claims, founded on constitutional grounds, were tried before this court in a non-jury trial on April 29, 1998 through May 1, 1998.

## II. Commercial and Economic Interests and Their Relevance

The plaintiff is a for-profit corporation that has operated a restaurant at 350 Middlesex Road in Tyngsborough under one name or another from about 1992 to the present. Through most of the years it has had a "pouring" license and an entertainment license. DHL's permits do not authorize adult entertainment at 350 Middlesex Road, but in fact the Town has not attempted to stop DHL's offering adult entertainment at that site in disregard of licensing and zoning requirements. In addition, other entities in Tyngsborough are providing adult entertainment, either with formal authorization or in violation of the licencing terms that the Town has not attempted to enforce while this case has been pending.

Because of plaintiff's commercial interest, if a distinction between commercial and non-commercial expression made a difference in outcome, this case should be treated as one involving a mix of municipal impediments to commercial speech, on one hand, and restraints on the interests of plaintiff and others in non-commercial expression and freedom of association, on the other hand.

Ordinarily a need exists for invoking the distinction between commercial and non-commercial expression only if the claims at issue would merit relief under the legal tests applicable to non-commercial expression. If claims would not merit relief under those legal tests, a determination that in some respects the claims were for protection of commercial rather than non-commercial forms of expression and association would weaken rather than strengthen the arguments for relief. In the circumstances of this case, however, commercial aspects may be significant in ways other than their bearing on protection for commercial speech. Comparisons among total economic consequences flowing from alternative proposals for accommodating clashing specially-valued interests, as well as comparisons between economic impacts on the plaintiff and economic impacts on the community, may be factors to be considered in applying a totality-of-the-circumstances legal test (or a multi-factor test short of a totality-of-the-circumstances test) for determining whether a federal-law claim for injunction or declaratory relief is meritorious.

## III. Authoritative Guidelines for Decision

### A. Summary of Conclusions About Guidelines

When specially-valued interests are present on only one side of a case in court, the law ordinarily treats an asserted need for protection of those specially-valued interests, if supported by proof, as outweighing opposing interests that the law does not recognize as specially-valued. If, however, an asserted

need for protection of opposing specially-valued interests is also supported by proof, then neither set of interests can be treated as entirely outweighing the other except by making a decision that disregards or denies protection for some interests that the law ordinarily recognizes as specially-valued.

■ After full consideration of all the sources of authoritative guidance for decision of which this court is aware, including all the state and federal constitutional, statutory, and decisional sources cited by the parties in their submissions to the court in this case, I conclude that in a case in which evidence supports assertions of specially-valued interests on both of the opposing sides, a court must aim for a resolution of the controversy that accommodates the clashing interests in an equitable and just way, if it is feasible to do so, rather than holding that one set of interests is more highly valued than the other and requires that the other set be sacrificed under a legally-imposed bright-line rule of priority among specially-valued interests.

■ A method of decision compatible with this aim is a two-part, factors-weighing method under which the court (1) considers, as a question to be answered, whether each among plausible alternative outcomes is a fair and appropriate resolution within the limits defined by law, and (2) considers, as factors to be weighed and evaluated, bearing upon the answer to that question, each assertion about one or the other of the clashing sets of interests that is supported by evidence and might plausibly be asserted to weigh significantly more favorably to the set of specially-valued interests on one side than to the set of specially-valued interests on the other side.

## B. The *Renton* Standard and Application

### 1. Introduction

■ Under *Renton v. Playtime Theatres, Inc.*, when a court is considering a constitutional challenge to a municipal zoning ordinance regulating adult entertainment, the appropriate inquiry is "whether the ... ordinance is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication." 475 U.S. 41, 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). This statement of the ultimate question to be answered is in its nature one that requires the deciding authority, whoever that may be (e.g., municipal or agency official, or jury or judge, or some combination of these), to apply a standard of judgment rather than a set of bright-line rules. What are the "factors" to be considered in applying that standard? Is the standard a totality-of-the-circumstances test or something very close to it?

### 2. Secondary Effects

■ The community concern about "secondary effects," as that concept applies in this case, is not concern about the dissemination of offensive expression itself, but rather concern about deterioration of an area within the town, as evaluated from a community perspective that takes into account adult businesses in the area, and the likelihood of an increase in crime and other negative effects associated with the deterioration. *See Young v. American Mini Theatres*, 427 U.S. 50, 71 n. 34, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). The town of Renton enacted the challenged zoning ordinance to prevent the secondary effects caused by adult theaters. *Renton*, 475 U.S. at 43, 106 S.Ct. 925. The Court of Appeals for the Ninth Circuit found the Renton ordinance unconstitutional because Renton had enacted the ordinance without the benefit of studies of secondary effects relating to the town of Renton itself. Instead, the town had relied on studies produced by and for the city of Seattle. *See id.* The Supreme Court held that Renton could rely on studies of other cities, noting that reliance on studies of other cities is permissible "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that city addresses." *Id.* at 51–52, 106 S.Ct. 925.

■ Plaintiff DHL argues, persuasively, that as applied to the present case, *Renton* means that the legislative body of Tyngsborough must do more to justify their zoning ordinance than say "we are scared of secondary effects." The record must show some reasoned basis for evaluation of potential sec-

ondary effects as sufficiently likely to occur and to involve significant consequences for community welfare to justify the challenged zoning ordinance. In this case, however, plaintiff's contention fails at the next step because that contention, as framed by plaintiff in its argument, is that the showing of the reasoned evaluation must appear in the minutes of the Town Meeting or in a transcript or other record of the Town Meeting at which the challenged legislative action was taken.

In this case, as a finder of fact, I find that the reasoned basis for the legislative decision was persuasively shown by the evidence at trial. I find credible and probative the testimony of John O'Gorman regarding his direction to Town Administrator and Special Town Counsel almost six weeks in advance of the legislative action, to gather as much information as could be obtained about how other cities and towns, large and small, were addressing issues regarding making some provision within the town for legally protected adult entertainment while also dealing effectively with secondary effects on police and fire resources, public safety, and compliance with building and licensing requirements. Also, Mr. O'Gorman's testimony was supplemented and corroborated by evidence received at trial regarding the Article prepared for Special Town Meeting upon which the Selectmen voted on March 29, 1994, evidence of the public discussion occurring in advance of the meeting, and a stipulation and testimony about the greater demands on police from calls to or near places of adult entertainment requiring police response, than from other areas of the community in general. In summary, the evidence in this case was distinctly contrary to plaintiff's argumentative characterization of being nothing more than citizens and legislative officials saying "we are scared of secondary effects."

### 3. Reasonable Opportunity to Open and Operate

The reviewing authority (an agency or a court) must examine the legislative process to see if the legislative body properly considered secondary effects, and then must examine the ordinance to see if it provides reasonable opportunity to open and operate protected adult entertainment. *See Renton,* 475 U.S. at 50, 106 S.Ct. 925. Although the 1987 and 1994 B-4 zones likely did not provide reasonable opportunity within identified zones, those ordinances have been superseded and their flaws and vulnerabilities are not the basis for injunctive or even declaratory relief with respect to the future. The 1996 zoning ordinance is the one in effect since its enactment. Thus, the constitutionality of the 1987 "phantom zone" and constitutionality of the 1994 single-available-lot-zone are not within the scope of a live controversy now before the court about whether the 1996 ordinance meets the required standard.

*Renton* requires only an inquiry into whether a site is potentially available as contrasted with "actually" available. *See Renton,* 475 U.S. at 53, 106 S.Ct. 925. The court must consider "whether relocation sites provided to a business may be considered part of an actual business real estate market," and then "after excluding those sites that may not properly be considered to be part of the relevant real estate market, [whether] there are an adequate number of potential relocation sites for already existing businesses." *Topanga Press, Inc. v. Los Angeles,* 989 F.2d 1524, 1529 (9th Cir.1993), *cert. denied,* 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994). This is not to say that the Constitution requires communities to make some minimum percentage of land available for the operation of adult businesses. *See North Ave. Novelties, Inc. v. Chicago,* 88 F.3d 441, 445 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 684, 136 L.Ed.2d 609 (1997).

The Court of Appeals for the Ninth Circuit set out a series of factors it considered in evaluating the reasonableness of the opportunity to relocate existing businesses in light of zoning changes:

(1) First, although *Renton* stresses that the First Amendment only requires a relocation site to be potentially available rather than actually available, the requirement of potentiality connotes genuine possibility ... we need determine only that property is not "potentially" available when it is

unreasonable to believe that it would ever become available to any commercial enterprise. (2) Second, ... relocation sites which are within manufacturing or industrial zones ... that are reasonably accessible to the general public may also be part of the market. (3) Third, areas in manufacturing zones which have proper infrastructure ... may be included in the market. (4) Fourth, when a relocation site suits some generic commercial enterprise, although not every particular enterprise, it too may be said to be part of the real estate market .... (5) Fifth, and most obvious, those relocation sites which are commercially zoned are part of the market. *Topanga Press*, 989 F.2d at 1531. Tyngsborough's 10.4 acre B–4 zone qualifies under *Topanga Press* in that the five Applewood parcels are potentially available, are accessible to the public, have proper infrastructure (or at least the possibility of proper infrastructure), suit some generic commercial enterprise, and are zoned as part of the market.

Availability of these five parcels, however, is not the only touchstone. The decisionmaker must also decide whether or not the five parcels offer enough to be reasonable, especially in light of Mr. Eriksen's testimony that the sites have not yet been available for sale, and in light of his vocal opposition to adult entertainment in Tyngsborough.

Regardless of whether or not the private property owner's personal stance on the issue is relevant, the amount of land offered is without question relevant, although not alone dispositive. Many courts have considered the percentage of the community's total land that is available for adult entertainment in the analysis of what amount of land was reasonable. *See, e.g., Alexander v. Minneapolis,* 928 F.2d 278, 283 (8th Cir. 1991) (finding the 13.5% of commercially zoned land in the city to be adequate); *Walnut Properties, Inc. v. Whittier,* 861 F.2d 1102, 1109 (9th Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 157 (1989) (finding only a fraction of the appropriately zoned 99.5 acres was potentially available in light of 1,000 foot distance restriction and that it could hardly be compared to the 520 acres upheld in *Renton*);

*Tri–State Video Corp. v. Stephentown,* 1998 WL 72331 at *8 (N.D.N.Y.1998) (finding 17% vacancy of 67% properly zoned land to be adequate); *Centerfold Club, Inc. v. St. Petersburg,* 969 F.Supp. 1288, 1303 (M.D.Fla. 1997) (finding the availability of 6.3% of the city's acreage to be adequate); *3570 East Foothill Blvd., Inc. v. Pasadena,* 912 F.Supp. 1257, 1265 (C.D.Cal.1995), *aff'd,* 99 F.3d 1147, (finding that where only one adult business existed, an ordinance that allowed for the opening of eleven more adult businesses provided reasonable opportunity); *Janra Enters. v. Reno,* 818 F.Supp. 1361, 1364 (D.Nev. 1993) (finding three parcels insufficient); *Schneider v. City of Ramsey,* 800 F.Supp. 815, 820 (D.Minn.1992), *aff'd,* 12 F.3d 140 (8th Cir.1993) (finding 2.5% of a rural community sufficient showing of reasonable opportunity); *International Eateries of Am., Inc. v. Broward County,* 726 F.Supp. 1556, 1567 (S.D.Fla.1987) (finding .03% of county land available to be inadequate).

Here, Tyngsborough has made 10.4 of its 10,540 acres (.09867%, or less than one-tenth of one percent of the land) in the town "available." This, however, is not the end of the inquiry to be made under the multi-factor test that this court (or some other decisionmaker) must apply to decide whether Tyngsborough has failed to provide a reasonable opportunity for adult entertainment businesses to open and operate. The question introduced in Part II of this opinion must be examined more closely. The comparison between the number of total acres of land in Tyngsborough and the acres declared to be "available" for adult entertainment businesses is only one factor of the applicable multi-factor legal test. Tyngsborough is a rural town in which the total acreage in the only commercial district that could properly be identified as the principal business district occupies very little of Tyngsborough's total acreage. This much is clear from the record, even though no party proffered evidence as to the precise acreage occupied by businesses in Tyngsborough. Most of the precedents cited by plaintiff involve regulation of adult entertainment establishments in urban cities. A mere acreage comparison may be appropriate in a city in which most of the land area

is developed, but in a rural community, where most of the land is undeveloped open space, a mere acreage comparison is not an adequate basis for determining the reasonableness of what the town has made available.

Regional availability may also be relevant where a single town is both rural and small. Again, however, the record in this trial does not include evidence that would enable the court to make findings of regional availability with precision.

■ Plaintiff also argues that the five parcels zoned B-4 are not potentially or actually available because all five sites are owned by a single individual, who is on the record at Town Meetings vocally opposing any zoning to permit adult entertainment. Plaintiff also introduced evidence at trial of restrictive covenants (Plaintiff's Exhibit No. 20) that Applewood Construction considered, but did not implement, for the industrial park that includes the five B-4 parcels.

Precedents do not make it clear and certain that Mr. Eriksen's opposition to adult entertainment establishments bears upon the issue to be decided. At least one court has examined the effect of private ownership of the available land and determined that

> [r]estrictive covenants or leases between third parties rendering a site unavailable to an adult establishment does not render the site unavailable for First Amendment purposes. Municipal or local governments are under no obligation either to dictate that third parties make their land available to adult establishments or to consider whether such private restrictions in fact exist.

*Centerfold Club, Inc. v. St. Petersburg,* 969 F.Supp. 1288, 1303 (M.D.Fla.1997). On the other hand, the Court of Appeals for the Fifth Circuit has suggested that land with "legal characteristics that exclude adult businesses may not be considered available for constitutional purposes." *See Woodall v. El Paso,* 959 F.2d 1305, 1306 (5th Cir.1992), *cert. denied,* 506 U.S. 908, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992).

If restrictive covenants prohibiting adult businesses are placed on the property, that will create a legal characteristic that makes the sites unavailable. Likewise, if Applewood Construction were presented with a genuine offer to buy (at a price that could be determined to be reasonable under a "reasonable buyer-reasonable seller" standard), and Applewood Construction refused to sell to an adult entertainment establishment, then the plaintiff would have evidence of the unavailability of the five parcels. But, the evidence before the court now consists of Walter Eriksen's testimony that if presented with the right price, he (or Applewood Construction) would sell to an adult entertainment establishment. Sites zoned by Tyngsborough to allow adult entertainment must be available, but they need not be at "bargain prices." *Renton,* 475 U.S. at 54, 106 S.Ct. 925.

DHL has operated an adult entertainment enterprise at 350 Middlesex Road since February, 1994. It has not thus far been denied any reasonable opportunity to operate. And the Blue Moon has been in continuous operation for over twenty years offering adult entertainment in Tyngsborough. Thus, Tyngsborough residents are not being denied access to this form of protected expression, nor are nonresidents being denied access to this form of protected expression in Tyngsborough. Even if Tyngsborough were to revoke DHL's entertainment license for violating its provisions, plaintiff has not shown that DHL would not have a reasonable opportunity to establish a venue on one of the Applewood sites.

Since DHL is not seeking money damages and has been operating, though without a permit, it has not been denied a reasonable opportunity to operate. Plaintiff has failed to show that these sites are too few in number for a community with the characteristics of Tyngsborough. Furthermore, plaintiff has not shown that the five sites are "not available" because of Mr. Eriksen's personal views on adult entertainment or his interests as a property owner in seeking the highest market value for his property. The 1987 phantom zone, and the 1994 zone too limited to comply with the requirements of *Renton,* do not change the fact that the 1996 zoning by-laws, brought Tyngsborough into compli-

ance in terms of reasonable opportunity to open and operate.

### C. A Perspective on Conduct of Parties Locked in Ongoing Dispute

In human relations, often one excess begets another. In law, never does one excess excuse another. Even in the law of defense of person against physical aggression, a privileged response must be measured to the need for protection and neither retaliatory nor vindictive. When parties choose to engage in this sort of contest, they also choose the rules of contest (either rules of civility, or rules of aggression). And a party who engages in a verbally slashing attack, supplemented by threats of noncompliance with licensing and zoning requirements, cannot reasonably expect capitulation and a velvet embrace by the opposing party. In the circumstances of suspension by Tyngsborough of enforcement of its licensing requirements, DHL has not attempted to prove that it has suffered damages. On the other hand, the actions by DHL in clear violation of its licenses do not excuse formal but phantom zoning, suitable on paper only and not in fact.

By the time of trial, if not long before, the parties to this case might have expected the court to view the case in this perspective. Though strident still, their contentions at trial were substantially less accusatory and aggressive toward each other than the record persuades me they had been through the years of development of this controversy. Moreover, the Supreme Court's decision in *Scott–Harris*, —— U.S. ——, 118 S.Ct. 966, —— L.Ed.2d—— (1998), substantially narrowed the scope of the issues this court had scheduled for trial when legal issues about the scope of legislative immunity of municipal officials, finally resolved in *Scott–Harris*, were still disputable. If those disputable issues of law had been resolved favorably to the plaintiff, the court would have been required to make findings regarding facts genuinely in dispute with respect to plaintiff's claim for an award of damages against the municipality and its individual officers who participated in decisions of a legislative character.

Having withdrawn its claim for a monetary award in light of *Scott–Harris*, plaintiff's primary position at trial was that neither its claims for injunctive and declaratory relief nor any of the defenses to those claims presented state-of-mind issues. Yet plaintiff's counsel sought repeatedly to offer evidence bearing on state-of-mind issues such as motive of various town officials, at the time of taking action under color of law, and scope of their knowledge at those times defendants previously acted and declared their plans for the future.

 Without ruling on sufficiency of proffered evidence to present a genuine dispute of material fact, the court overruled objections to state-of-mind evidence proffered by each party if in the court's view, at the time of ruling, the proffered evidence was at least relevant and of sufficient probative weight to be potentially material when considered together with other evidence received at trial. With the completion of the trial and with the entire record now before me, as finder of facts I find that on all claims I decide (which, as explained in Part V below, do not include state-law claims), the state-of-mind evidence received at trial was insufficient to persuade me by a preponderance of the evidence that any of the challenged actions of town officials under color of law were both non-legislative in character and accompanied by a motive to impede or interfere with legally protectable interests of plaintiff in freedom of expression and freedom of association. Thus, plaintiff's federal-law claims against the municipality and the individual defendants in this case fail because of the combined effect of applicability of legislative immunity as explained in *Scott–Harris* and lack of proof of any non-legislative act under color of law with a state-of-mind that would defeat qualified immunity.

### IV. Declaratory Relief, Supplemental Jurisdiction over State-law Claims, and Federalism

 A United States district court may grant declaratory relief in a case of actual controversy within its jurisdiction. 28 U.S.C. § 2201. The Declaratory Judgment Act did not create a right for the litigant; rather, it

added a remedy that a court may grant in the exercise of discretion. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287–89, 115 S.Ct. 2137, 2143, 132 L.Ed.2d 214 (1995); *EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed.Cir. 1996).

█ Even if I were to find that the net evaluation of all relevant factors weighed in favor of finding a federal constitutional violation, which I have not, I would conclude that this court should not exercise its discretionary authority to grant declaratory relief in this case for several reasons.

First. As explained in Part II of this Opinion, the evaluation of the total economic implications for the public and the parties to this litigation, and the economic effects incident to plaintiff's requested declaratory relief in comparison with economic effects incident to alternative ways of providing reasonable opportunity for adult entertainment businesses at or near the site plaintiff proposes (350 Middlesex Road) weigh against plaintiff's choice of remedy.

Second. The evidence before me shows that DHL has offered nude dancing entertainment since 1994, without interference from the Town of Tyngsborough. At least until now, DHL has suffered no economic loss as a result of the zoning ordinance. Thus, the plaintiff's request for relief is essentially, "intended to fortify the litigant against future regulation," and therefore not a case in which declaratory relief should be granted. *Public Serv. Comm. v. Wycoff Co.*, 344 U.S. 237, 247, 73 S.Ct. 236, 97 L.Ed. 291 (1952).

Third. Although I have not undertaken a constitutional case-or-controversy assessment, it is not at all clear that plaintiff has met that requirement.

These characteristics of this case also support this court's decision not to exercise supplemental jurisdiction over plaintiff's state-law claims. Accordingly, a declaration of the rights of the parties with respect to federal-law claims would not resolve the entire conflict between the parties. Moreover, the legislature and the courts of the Commonwealth of Massachusetts have developed a body of state law regarding protected expression and local zoning law. *See, e.g., T & D Video v. City of Revere*, 423 Mass. 577, 670 N.E.2d 162, 166 (1996).

Fourth. Because plaintiff has not met its burden on its federal-law claims, the interests of comity and federalism weigh heavily in favor of this court's declining to grant declaratory relief on predicted premises of future circumstances that may never arise in fact. The more appropriate course is to remand state-law claims to the state courts. This disposition of the case in this court will maintain fidelity to principles of federalism and foster respect for state-created accommodations of federal constitutional constraints and state interests. *See El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 497 (1st Cir.1992).

Fifth. The decision to grant declaratory relief is supported also by the guiding principle explained by the Supreme Court of the United States in *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, is "an enabling Act" conferring "a discretion on the courts rather than an absolute right upon the litigant," and creating not a duty but "an opportunity" that ordinarily is to be exercised, and in appropriate exceptional circumstances a United States district court may in the exercise of discretion decline to grant declaratory relief. *Id.* (citations omitted). I find this case, with all its distinctive characteristics explained in this Opinion, to be a case in which the exercise of discretion counsels against an order of declaratory relief that would of necessity be tailored to uncertain predictions about relationships between plaintiff and defendants as they may develop in the future.

The state-law claims that remain unresolved include challenges to zoning ordinances and acts of municipal officials bearing upon the adoption and implementation of zoning.

█ I recognize that this court has discretionary supplemental jurisdiction, in appropriate circumstances, *see United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), over state-law claims

of the general type plaintiff asserts. This case, however, is in my judgment an apt one for declining to exercise supplemental jurisdiction.

> [T]he termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but rather, sets the stage for an exercise of the court's inferred discretion .... In deciding whether or not to retain jurisdiction on such an occasion, the trial court must take into account concerns of comity, judicial economy, convenience, fairness, and the like.

See *Roche v. John Hancock Mutual Life Ins. Co.*, 81 F.3d 249, 256 (1st Cir.1996) (citations omitted).

## V. Conclusion

As plaintiff can no longer recover monetary damages in light of *Scott–Harris*, its only remaining requests are associated with declaratory or injunctive relief. I have concluded that it is inappropriate, in this case, for this court to exercise its discretionary authority to grant declaratory relief on plaintiff's federal-law claims. I have concluded also that plaintiff's remaining state-law claims should be remanded to Middlesex Superior Court for adjudication. Thus, in the proceedings in this court the plaintiff has not prevailed and is not entitled to an award of attorneys fees.

### Order

For the foregoing reasons it is hereby ORDERED:

The Clerk is directed to enter forthwith on a separate document a Final Judgment as follows:

> On the stipulations of the parties, the uncontested proposed findings of fact, the rulings of the court made in pretrial proceedings and at trial, and on findings and conclusions explained in the Opinion of May 7, 1998, it is ORDERED:
>
> (1) Judgment in favor of defendants on plaintiff's federal constitutional claims;
>
> (2) Plaintiff's remaining state-law claims are remanded to Middlesex Superior Court for further proceedings;

(3) All parties are to bear their own costs and attorneys fees.