In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-4126 & 98-4209

Joseph Schultz, doing business as Island Bar,
and Tonya Norwood,

Plaintiffs-Appellees/Cross-Appellants,

v.

City of Cumberland,

Defendant-Appellant/Cross-Appellee.

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 98 C 107--Barbara B. Crabb, Judge.

Argued September 9, 1999--Decided September 26, 2000

Before Coffey, Kanne and Evans, Circuit Judges.

Kanne, Circuit Judge.  The City of Cumberland had
sought for years to close the Island Bar, a strip
club within the small Wisconsin town, when it
enacted a municipal ordinance regulating
"sexually oriented businesses." The ordinance
imposed comprehensive regulations on the
operation of adult-entertainment establishments
in Cumberland. In response, Joseph Schultz, the
Island Bar's owner, and Tonya Norwood, an Island
Bar exotic dancer, sued in district court
challenging the ordinance's constitutionality
under the First Amendment. We uphold the portions
of the ordinance that serve as reasonable time,
place or manner restrictions and strike the
portions of the ordinance that ban sexually
explicit dance movements and disqualify certain
persons from holding adult-entertainment
licenses.

I.  History

In Cumberland, Wisconsin, the Island Bar is the
lone sexually oriented business located in the
small town of 2,200 residents. The Island Bar
opened in 1993 and quickly attracted notoriety
when Schultz converted the bar into a strip club
featuring nude female dancers, including co-
plaintiff Norwood. After assiduous undercover
investigation by Barron County law enforcement,

Cumberland authorities discovered prostitution and sexual contact between nude dancers and bar patrons, and revoked the Island Bar's liquor license on October 12, 1994. The Island Bar later reopened as a non-alcoholic bar, still featuring nude female dancing, but two convictions of Island Bar patrons for prostitution in March 1997 led to its closing for one year under Wis. Stat. sec. 823.13 as a public nuisance. See State v. Schultz, 582 N.W.2d 113 (Wis. Ct. App. 1998).

Unsatisfied with the one-year closure, the Cumberland city council established a municipal planning subcommittee dedicated to exploring more restrictive methods of regulating nude dancing. Happy to offer assistance were conservative interest groups devoted to fighting "sexually oriented businesses" (wittily abbreviated as "SOBs"). For example, the National Family Legal Foundation ("NFLF") provided a comprehensive handbook entitled Protecting Communities From Sexually Oriented Businesses. The handbook explains that it "is not meant to be a neutral overview of current methods of regulating 'adult' businesses. This is a 'how-to' manual for those who are serious about protecting their communities and doing battle with the incredibly powerful and profitable sex club industry." Copying virtually verbatim the NFLF's model regulation, Cumberland received comments on its new draft ordinance from the NFLF and Morality in Media, Inc., among others.

Following the NFLF's instructions on "Making the Legislative Record," Cumberland set about constructing legislative findings to support the NFLF ordinance in their community. The Cumberland committee in charge of drafting the ordinance divided research duties among its members. Mayor Lawrence Samlaska reviewed police reports and spoke to the Cumberland police about its investigation of crime at the Island Bar. Committee member Jeffrey Streeter researched the appropriate zoning location for sexually oriented businesses to minimize depreciation of real estate values and disturbances of the peace. Committee member Richard Nerbun obtained current health statistics from the Centers for Disease Control on sexually transmitted diseases and included them in the ordinance findings. Nerbun also considered the appropriate hours of operation for sexually oriented businesses, taking into account the proximity of the Island Bar to schools and school bus stops, citizen safety issues, the school schedule and hours-of-operation provisions in the ordinances of other cities. Committee member Carolyn Burns examined past cases involving municipal regulation of adult entertainment and reviewed studies published by other communities concerning the

negative effects of adult businesses on surrounding neighborhoods. Based ostensibly on this research, supplemented heavily by NFLF assistance, the subcommittee drafted a legislative preamble lifted from the NFLF model ordinance. It expressed Cumberland's concern about the adverse effects of sexually oriented businesses on "the health, safety and welfare of the patrons of such businesses as well as the citizens of the City," including "prostitution and sexual liaisons of a casual nature," "sexually transmitted diseases," the "deleterious effect on both the existing businesses around them and the surrounding residential areas adjacent to them" and "objectionable operational characteristics, particularly when they are located in close proximity to each other, thereby contributing to urban blight and downgrading the quality of life in the adjacent area."

After a public hearing, the Cumberland planning commission voted to recommend the ordinance to the city council, and on January 6, 1998, the city council unanimously adopted City of Cumberland Ordinance 12.15 ("Ordinance"), establishing a licensing and regulatory system for all "sexually oriented businesses." First, the Purpose and Findings Section explains that the Ordinance has "neither the purpose nor effect of imposing a limitation or restriction on the content of any communicative materials." Instead, the purpose of the Ordinance is "to regulate sexually oriented businesses in order to promote the health, safety, morals, and general welfare of the citizens of the City" based on "the adverse secondary effects of adult uses on the community presented in hearings and in reports made available to the Council, and on findings incorporated in the cases of City of Renton v. Playtime Theaters, Inc., 475 U.S. 41 (1986), Young v. American Mini Theatres, 427 U.S. 50 (1976), and Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991), and on studies in other communities."

Second, Section II defines the different types of sexually oriented businesses subject to the Ordinance. Cumberland and the plaintiffs agree that the Island Bar is covered by the definitions for two categories of sexually oriented business: "adult theater" and "adult cabaret." Section II(3) defines "Adult Cabaret":

a nightclub, bar, restaurant, or similar commercial establishment which regularly features:

(a) persons who appear in a state of nudity or semi-nude; or

(b) live performances which are characterized by the exposure of "specified anatomical areas" or by "specified sexual activities"; or

(c) films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas."

Section II(7) defines "Adult Theater":

a theater, concert hall, auditorium, or similar commercial establishment which regularly features persons who appear in a state of nudity or semi-nude, or live performances which are characterized by the exposure of "specified anatomical areas" or by "specified sexual activities."

In addition, the definitions for "adult arcade," "adult bookstore, novelty store or video store," "adult motel," "adult motion picture theater" and "adult mini-motion picture theater" all incorporate the phrase "characterized by the depiction or description of 'specified sexual activities' or 'specified anatomical areas.'" Specified sexual activities include "the fondling or other erotic touching of human genitals, pubic region, buttocks, anus, or female breasts"; "sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation, masturbation, or sodomy"; and "excretory functions" in connection with sexual activity. Cumberland Municipal Code Section 12.15, at sec. II(24). Specified anatomical areas include "(a) the human male genitals in a discernibly turgid state, even if completely and opaquely covered; or (b) less than completely and opaquely covered human genitals, pubic region, buttocks or a female breast below a point immediately above the top of the areola." Id. at sec. II(22).

  Third, Section VIII(A) declares the following: "It shall be a violation for a person who knowingly and intentionally, in a sexually oriented business, appears in a state of nudity or depicts specified sexual activities." The Ordinance defines "a state of nudity" as the following:

[T]he showing of the human male or female genitals, pubic area, vulva, anus, anal cleft or cleavage with less than a fully opaque covering, the showing of the female breast with less than fully opaque covering of any part of the nipple, or the showing of the covered male genitals in a discernibly turgid state.

Section VIII(B) makes it a "violation" for an

employee of a sexually oriented business to appear even semi-nude, unless the employee does not receive any pay or gratuity from customers and remains on a stage at least two feet off the floor and at least ten feet from any customer. The Ordinance defines "semi-nude condition" as the following:

[T]he showing of the female breast below a horizontal line across the top of the areola at its highest point or the showing of the male or female buttocks. This definition shall include the entire lower portion of the human female breast, but shall not include any portion of the cleavage of the human female breast, exhibited by a dress, blouse, skirt, leotard, bathing suit, or other wearing apparel provided the areola is not exposed in whole or in part.

Fourth, the Ordinance imposes operating restrictions and licensing requirements on sexually oriented businesses. Section X limits sexually oriented businesses (except adult motels) to business hours of 10 a.m. to midnight Monday through Saturday, closed on Sunday. Sections XI and XIII require operators of sexually oriented businesses and their employees to obtain licenses from Cumberland. Section XIII(A) explains that Cumberland must issue an employee license within thirty days of application unless it finds any of the enumerated reasons for denial, including overdue payment of Cumberland taxes, fees or fines; recent denial or revocation of a license or recent conviction for a sex-related crime by the applicant or a cohabitant of the applicant; and non-approval of the premises of the sexually oriented business by Cumberland inspectors under applicable laws and ordinances./1 Applicants must provide a legal name and any aliases, proof of age, residential and business addresses, a recent photograph, a physical description, fingerprints, driver's license information, a Social Security number and the specified sex-related criminal history and sexually oriented business license history for both the applicant and the applicant's cohabitants. See id. at sec. XI(D)-(G). Applicants for operators' licenses must divulge all this information in addition to the identities of any partners, directors and principal stockholders, and diagrams of both the business's interior and the 750-square-foot area surrounding the business's exterior. See id. Section XIII(C) provides that Cumberland will issue an operator's license within thirty days of receipt of a completed application, unless it finds any of eight enumerated reasons by a preponderance of the evidence.

Section XIII(E) guarantees that the health

department, fire department and building official shall complete their inspection of an applicant's premises, necessary for licensing, within twenty days of the application. Each application for a sexually oriented business license requires a $100 application and investigation fee. See id. at sec. XIV(A). Section XVIII promises that judicial review of denial, refusal to renew or suspension of a license will be "promptly reviewed" by a court of competent jurisdiction.

Fifth, Section XXII contains a sweeping severability provision:

In the event any section, subsection, clause, phrase or portion of this ordinance is for any reason held illegal, invalid or unconstitutional by any court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent provision, and such holding shall not affect the validity of the remainder of this ordinance. It is the legislative intent of the Common Council that this ordinance would have been adopted if such illegal provision had not been included or any illegal application had not been made.

On February 8, 1998, the plaintiffs sued Cumberland in district court seeking a permanent injunction against enforcement of the Ordinance, alleging under 42 U.S.C. sec. 1983 that the Ordinance violates their First Amendment rights to present nude dancing at the Island Bar. Cumberland agreed not to enforce the Ordinance until the district court reached decision on summary judgment. On November 5, 1998, the district court held that the Ordinance imposed content-neutral restrictions on expressive conduct and upheld the Ordinance's operating regulations. See Schultz v. City of Cumberland, 26 F.Supp.2d 1128, 1144 (W.D. Wis. 1998). However, the court also found that the Section VIII(A) nudity ban is unconstitutionally overbroad and that the employee-disclosure provisions and several operator-license requirements lacked rational connection in the record to be deemed narrowly tailored to the Ordinance's purposes. See id. at 1150-51. After finding the defective sections of the Ordinance non-severable from the valid provisions, the court granted summary judgment in favor of the plaintiffs and permanently enjoined enforcement of the Ordinance. See id. at 1152.

II.  Analysis

Although once furiously debated, it is now well-established that erotic dancing of the sort practiced at the Island Bar enjoys constitutional protection as expressive conduct. See City of

Erie v. Pap's A.M., ___ U.S. ___, 120 S.Ct. 1382, 1385 (2000); Miller v. Civil City of South Bend, 904 F.2d 1081, 1087 (7th Cir. 1990), rev'd sub nom. on other grounds, Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991). Of course, no one argues that erotic dancing at the Island Bar represents high artistic expression, but "[n]ude barroom dancing, though lacking in artistic value, and expressing ideas and emotions different from those of more mainstream dances, communicates them, to some degree, nonetheless." Miller, 904 F.2d at 1087. The Supreme Court has agreed, explaining that "nude dancing of the type at issue here is expressive conduct, although . . . it falls only within the outer ambit of the First Amendment's protection." Erie, 120 S.Ct. at 1391 (addressing nude barroom dancing); see also Barnes, 501 U.S. at 566 ("[N]ude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so."). Moreover, "[s]exual expression which is indecent but not obscene is protected by the First Amendment." Sable Communications of California, Inc. v. FCC, 492 U.S. 115, 126 (1989). Entertainment may not be prohibited "solely because it displays the nude human figure. '[N]udity alone' does not place otherwise protected material outside the mantle of the First Amendment." Schad v. Borough of Mount Ephraim, 452 U.S. 61, 66 (1981) (citations omitted).

While the parties agree that nude dancing receives First Amendment protection, this case presents three disputed issues on appeal. The first question is whether the operating restrictions in Sections X and VIII(A) are unconstitutional content-based regulations of expression or legitimate time, place or manner restrictions. The second question is whether Section VIII(A) is overbroad. The third question is whether the licensing provisions in Sections XI and XIII are unconstitutional prior restraints on expression. We review de novo the district court grant of summary judgment. See Matney v. County of Kenosha, 86 F.3d 692, 695 (7th Cir. 1996).

A.  Operating Regulations
for Sexually Oriented Businesses

The plaintiffs challenge the Section X hours-of-operation restriction and the Section VIII(A) ban on live nudity and sexually explicit gestures as content-based regulations of protected expression. They argue that these provisions of the Ordinance are content-based on their face because they explicitly target adult entertainment. The Ordinance applies only to

sexually oriented businesses, which are defined by the Ordinance with reference to the expressive activity performed inside. In response, Cumberland admits that the Ordinance applies only to adult-entertainment establishments. Nonetheless, Cumberland insists that the Ordinance is a content-neutral regulation of nudity viable under the secondary-effects theory of Barnes v. Glen Theatre, Inc., 501 U.S. 560, and City of Erie v. Pap's A.M., 120 S.Ct. 1382.

The Supreme Court has long held that regulations designed to restrain speech on the basis of its content are subject to strict scrutiny and are presumptively invalid under the First Amendment. See R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992); City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47 (1986); Stromberg v. California, 283 U.S. 359, 368-69 (1931). Content-based regulations "by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed." Turner Broadcasting Sys., Inc. v. FCC, 512 U.S. 622, 643 (1994). Since "it is the content of the speech that determines whether it is within or without the [regulation]," they single out certain viewpoints or subject matter for differential treatment. Carey v. Brown, 447 U.S. 455, 462 (1980); see also City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429 (1993). These regulations draw strict scrutiny because their purpose is typically related to the suppression of free expression and thus contrary to the First Amendment imperative against government discrimination based on viewpoint or subject matter. See Texas v. Johnson, 491 U.S. 397, 403 (1989). Owing to the profound national commitment to robust, open debate, "[t]he First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed." R.A.V., 505 U.S. at 382 (internal citations omitted). The government cannot favor one viewpoint over another, see City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984), nor can the government suppress an entire category of speech, even if the regulation is viewpoint-neutral within that category of speech, because the First Amendment bars "prohibition of public discussion of an entire topic." See Consolidated Edison Co. v. Public Serv. Comm'n, 447 U.S. 530, 537 (1980).

In contrast, content-neutral regulations are justified without reference to the content of the regulated speech and do not raise the specter of government discrimination. See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771 (1976). These regulations do not refer to expressive content

and do not single out a particular viewpoint or category of speech for different treatment. Instead, all speech is treated similarly in an effort to advance significant government interests unrelated to content. A general ban on speech in the vicinity of a school is content-neutral, see Grayned v. City of Rockford, 408 U.S. 104, 119-20 (1972), whereas an analogous ban on speech containing an exemption for speech relating to labor disputes is content-based. See Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95 (1972). The former regulation requires no consideration of content before applying the ban, while the latter regulation requires consideration whether the speech in question refers to a labor dispute before it is possible to determine if the regulation applies. When the government treats all expression equally without regard to the ideas or messages conveyed, courts can be more certain that the government intends to serve important interests unrelated to suppression of speech and is not acting with censorial purpose. In that vein, the government may institute reasonable time, place or manner regulations that apply to all speech alike, such as restrictions on sound amplification at an outdoor bandshell, see Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989), or a prohibition on targeted residential picketing. See Frisby v. Schultz, 487 U.S. 474, 488 (1988). Such regulations control the surrounding circumstances of speech without obstructing discussion of a particular viewpoint or subject matter.

However, the First Amendment tolerates greater interference with expressive conduct, provided that this interference results as an unintended byproduct from content-neutral regulation of a general class of conduct. In most cases, the government may regulate conduct without regard to the First Amendment because most conduct carries no expressive meaning of First Amendment significance. See Graff v. City of Chicago, 9 F.3d 1309, 1315-16 (7th Cir. 1993). However, broad regulations of conduct implicate First Amendment concerns when they apply to specific instances of expressive conduct. For example, in United States v. O'Brien, 391 U.S. 367, 382 (1968), the Court considered whether a ban on destroying draft cards violated the First Amendment, given that draft-card burning represented a powerful symbol of political protest at the time. The government argued that the ban was necessary for the administration of the Selective Service program, and as the Court explained, the statute "plainly does not abridge free speech on its face . . . . [It] on its face deals with conduct having no connection with speech." Id. at 375. The effect on expression was

merely incidental to the content-neutral ban on the general class of conduct because the ban applied to draft-card destruction of all forms, not only to draft-card burning intended as expression. Although it recognized the symbolic conduct of draft-card burning as First Amendment expression, the Court applied intermediate scrutiny because the restraint on expression was only an "incidental burden" generated by the government's content-neutral attempt at furthering significant governmental interests unrelated to the suppression of speech. See O'Brien, 391 U.S. at 382; see also Erie, 120 S.Ct. at 1391; Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984). As a result, the government "generally has a freer hand" with respect to expressive conduct than with respect to verbal expression. Johnson, 491 U.S. at 406. When the government enacts a content-neutral regulation on a class of conduct, citing the harmful secondary effects related to that conduct, i.e., the subsidiary effects or "noncommunicative impact" of the speech, courts presume that the government did not intend to censor speech, even if the regulation incidentally burdens particular instances of expressive conduct. See Erie, 120 S.Ct. at 1392.

As such, a general prohibition on all public nudity receives intermediate scrutiny, rather than strict scrutiny, when the government offers as its legislative justification the suppression of public nudity's negative secondary effects. See id. In Barnes, the Court upheld as content-neutral an Indiana public-indecency statute prohibiting nudity in public places because the statute was directed at preventing prostitution, sexual assaults and other criminal activity associated with adult entertainment--government interests "not at all inherently related to expression." Barnes, 501 U.S. at 585 (Souter, J., concurring)./2 In Erie, the Court sustained an ordinance nearly identical to the Barnes statute banning all public nudity because the government's predominant purpose again was to combat the harmful secondary effects of public nudity. See Erie, 120 S.Ct. at 1392. In both cases, plaintiffs challenged these facially content-neutral proscriptions on conduct because the broad prohibitions incidentally illegalized some expression as well, namely nude dancing. The Court upheld both regulations because each was nondiscriminatory on its face with respect to content and each cited as its legislative justification the abatement of public nudity's noxious secondary effects. See id. at 1391-93; Barnes, 501 U.S. at 585 (Souter, J., concurring). As the Court explained, "there is nothing objectionable about a city passing a general ordinance to ban public nudity (even though such

a ban may place incidental burdens on some protected speech)." Erie, 120 S.Ct. at 1394. In neither case did the regulation outlaw nude dancing specifically or refer to expressive content; the restriction on nude dancing resulted incidentally from the general, content-neutral prohibition on all public nudity.

Cumberland argues that the Ordinance is constitutional under Barnes and Erie because the Ordinance is justified without reference to communicative content and supported by a legislative record of pernicious secondary effects. The nominal purpose of the Cumberland Ordinance was addressing secondary effects allegedly affiliated with nude dancing, including "prostitution and sexual liaisons of a casual nature," "sexually transmitted diseases" and "urban blight and downgrading the qualify of life in the adjacent area." Cumberland mustered extensive efforts to construct a legislative record substantiating their concerns, and the Ordinance offers the city council's research as legislative findings and articulates the abatement of secondary effects as its purpose. Moreover, as the Court commended in Erie, Cumberland referenced the evidentiary foundation set forth in previous Supreme Court decisions regarding the baneful secondary effects of adult entertainment. Erie, 120 S.Ct. at 1395; cf. Renton, 475 U.S. at 50-52. But see Erie, 120 S.Ct. at 1403-05 (Souter, J., dissenting in part) (arguing that the government must demonstrate a particularized factual basis for finding evidence from previous cases to be relevant). Cumberland argues that its significant government interest in stemming harmful secondary effects justifies all the Ordinance regulations of adult entertainment, including the ban on nudity and certain sexually explicit movements.

However, in patent contrast to the regulations in Barnes and Erie, the Ordinance is not a content-neutral prohibition on a general class of conduct. Like the Barnes and Erie regulation, the Cumberland Ordinance bans nudity. But unlike the Barnes and Erie regulation, the Ordinance bans it with reference to certain expressive content. We can see this by examining the Ordinance definitions for various types of sexually oriented businesses to which the Ordinance arrogates within its Section VIII(A) ban on live nudity and sexually explicit movements, Section X operating restrictions and Section XI and XIII licensing provisions. Specifically, the plaintiffs challenge Section II(3) and II(7), which define "adult cabaret" and "adult theater" respectively and apply to the Island Bar. Both these sections cover a commercial establishment that "regularly features . . . live performances

which are characterized by the exposure of 'specified anatomical areas' or 'specified sexual activities.'" This definition is the predominant one in the Ordinance for defining sexually oriented businesses, appearing within the definitions for adult arcade, adult motel, adult motion picture theater, adult mini-motion picture theater and adult bookstore, novelty store or video store, in addition to those for adult theater and adult cabaret./3

  This definition on its face targets erotic expression. According to Webster's Third New International Dictionary, the word "performance" in this context means "a public presentation or exhibition . . . <the play ran for 285 [performances]> <the orchestra gave a benefit [performance]>" or "something resembling a dramatic representation." Webster's Third New Int'l Dictionary 1678 (1986). This term undeniably denotes communicative content and applies explicitly to expression, not mere conduct. The qualifier "characterized by the exposure of 'specified anatomical areas' or 'specified sexual activities'" then indicates the type of content that expression must convey to fall inside the Ordinance's reach. "Characterize" means "to describe the essential character or quality of" or "to be a distinguishing characteristic." Id. at 376. The Ordinance therefore discriminates against establishments that regularly feature certain expressive conduct distinguished by sexual content. Cumberland modeled its definition on the discriminatory ordinances in Renton and Young v. American Mini Theatres, 427 U.S. 50 (1976), which defined the regulated adult material in those cases as "distinguished or characterized by their emphasis on matter depicting, describing or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas.'" Indeed, following the Supreme Court's lead, we already have held that a substantially similar definition specifically singled out adult entertainment for different treatment. See Entertainment Concepts, Inc. v. Maciejewski, 631 F.2d 497, 504 (7th Cir. 1980); see also Richland Bookmart, Inc. v. Nichols, 137 F.3d 435, 438-39 (6th Cir. 1998); International Eateries of America, Inc. v. Broward County, 941 F.2d 1157, 1160-61 (11th Cir. 1991).

  As a result, we regard the Ordinance as content-based. The Ordinance applies only to certain establishments characterized by their presentation of live performances with particular erotic content, and it is the presentation of expressive content that determines whether particular establishments are within or without the regulation. In City of Cincinnati v. Discovery Network, Inc., 507 U.S. at 429, the

Court explained that a ban on newsracks containing commercial handbills was content-based because "whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'" By the same token, the Cumberland Ordinance is content-based on its face because whether an establishment falls within the Ordinance's sweep is determined by the content of expression inside it. Cf. Berg v. Health & Hosp. Corp., 865 F.2d 797, 802 (7th Cir. 1989) (finding an ordinance content-neutral because "it makes no distinction between types of films or entertainment."). As we explained in DiMa Corp. v. Town of Hallie, 185 F.3d 823, 828 (7th Cir. 1999), an ordinance that regulates only adult-entertainment businesses "singles out adult-oriented establishments for different treatment based on the content of the materials they sell or display." See also National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 738 (1st Cir. 1995) (stating that facial discrimination is "a telltale harbinger of content-based regulation"). The Ordinance restrictions on nude dancing are not incidental byproducts from the content-neutral regulation of a larger, inclusive class of nonexpressive conduct. Unlike the statute in O'Brien, for example, which "plainly does not abridge free speech on its face," 391 U.S. at 374, the Ordinance by its plain terms specifically targets erotic expression.

This quality sharply distinguishes the Ordinance from the regulations examined in Erie, Barnes and other cases elaborating the permissibility of incidental burdens from the regulation of general conduct. Those cases analyzed content-neutral regulations of conduct and depended on the consequent presumption of government nondiscrimination. The government could lawfully prohibit an entire class of conduct, so long as it did not define the regulated conduct with reference to expressive content. See Clark, 468 U.S. at 293; O'Brien, 391 U.S. at 382; see also Arcara v. Cloud Books, Inc., 478 U.S. 697, 707 (1986) (distinguishing regulations of general applicability from regulations that inevitably single out those engaged in First Amendment protected activities for the imposition of its burden). Thus, for example, an ordinance forbidding all camping and sleeping in downtown Washington, D.C., withstood a constitutional challenge because it was content-neutral on its face, even though its application to certain demonstrators who intended to stay overnight in Lafayette Park effectively squelched their protest. See Clark, 468 U.S. at 293.

Similarly, the public-indecency regulation in Barnes and Erie does not articulate its prohibitions with any reference to expressive content. It prohibits public nudity "across the board" in a facially content-neutral manner, Barnes, 501 U.S. at 566, and "does not target nudity that contains an erotic message; rather, it bans all public nudity, regardless of whether that nudity is accompanied by expressive activity." Erie, 120 S.Ct. at 1391. The regulation applied to nude dancing only because it was a form of public nudity, even though the unintended effect of this application was the restriction of adult entertainment. However, neither Erie nor Barnes applied a secondary-effects rationale to a discriminatory regulation that expressly targets nude dancing or adult entertainment for prohibition. See International Eateries, 941 F.2d at 1161 (refusing to apply Barnes to an ordinance that singles out nude dancing for regulation); see also R.A.V., 505 U.S. at 394 (questioning whether "an ordinance that completely proscribes, rather than merely regulates, a specified category of speech can ever be considered to be directed only to the secondary effects of such speech."). As the Supreme Court has explained, the mere assertion of a content-neutral purpose does not "save a law which, on its face, discriminates based on content." Turner Broadcasting, 512 U.S. at 642-43. A secondary-effects rationale by itself does not bestow upon the government free license to suppress specific content or a specific message because such a regime would permit the government to single out a message expressly, formulate a regulation that prohibits it, then draw content-neutral treatment nonetheless simply by producing a secondary-effects rationale as pretextual justification. See Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 794 (1994) (Scalia, J., dissenting in part) ("The vice of content-based legislation--what renders it deserving of the high standard of strict scrutiny--is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes."). As a result, we have never applied Barnes or Erie to cases in which the government regulation by its plain language targets adult entertainment, even when justified by secondary-effects theories. See DiMa, 185 F.3d 823; North Ave. Novelties, Inc. v. City of Chicago, 88 F.3d 441 (7th Cir. 1996); Matney, 86 F.3d 692.

Nevertheless, the fact that the Ordinance definition is content-based on its face does not necessarily dictate that the Ordinance is analyzed as content-based and subjected to strict scrutiny. See DiMa, 185 F.3d at 828; Richland Bookmart, 137 F.3d at 439. Some time, place or

manner regulations are treated as content-neutral, even though they are content-based on their faces. Courts at times have referred to these regulations as content-neutral, since they are treated as such in certain contexts. See, e.g., 11126 Baltimore Blvd., Inc. v. Prince George's County, Md., 58 F.3d 988, 995 (4th Cir. 1995). But these courts often called them content-neutral without explaining that the regulations are in fact content-based and only analyzed as content-neutral when certain preconditions are met. See DiMa, 185 F.3d at 828 (explaining that the Supreme Court held this type of content-based regulation is to be "treated like content-neutral time, place, and manner regulations, not that it was content-neutral."); Richland Bookmart, 137 F.3d at 439. At least in the domain of adult entertainment, discriminatory time, place or manner restrictions can be upheld as content-neutral restrictions on adult entertainment if they (1) are justified without reference to the content of the regulated speech; (2) are narrowly tailored to serve a significant government interest in curbing adverse secondary effects; and (3) still leave open ample alternative channels for communication. See Renton, 475 U.S. at 47; Young, 427 U.S. at 61; DiMa, 185 F.3d at 828. This standard strikes a healthy balance between the citizenry's First Amendment interests and the government's legitimate interests unrelated to suppression of speech. The government may further substantial state interests by directing speech through certain avenues rather than others, but only if the government's means preserve legitimate opportunity for continued speech. Even when actuated by a secondary-effects motive, the government may not "deprive the public of its ability to 'satisfy its appetite for sexually explicit fare.'" Matney, 86 F.3d at 697-98 (quoting Berg, 865 F.2d at 803).

Content-discriminatory time, place or manner regulations received intermediate scrutiny in Renton and Young because the government did not censor expression and instead advanced zoning schemes supported by secondary-effects rationales. Renton, 475 U.S. at 54; Young, 427 U.S. at 72-73. Although neither addressed nude dancing, both ordinances targeted adult-film entertainment on the basis of content. With language similar to the Cumberland Ordinance, those ordinances defined the regulated adult material as that "distinguished or characterized by their emphasis on matter depicting, describing or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas.'" Discriminatory on their faces, the ordinances did not ban adult entertainment; instead, the ordinances imposed on adult bookstores and theaters geographic-zoning

restrictions that fell comfortably within the rubric of a time, place or manner regulation. Inside the appropriate zones, sexually oriented establishments were permitted to purvey adult entertainment "essentially unrestrained." Young, 427 U.S. at 62; see also North Ave. Novelties, 88 F.3d at 444. The Renton ordinance isolated adult entertainment in concentrated regions to protect residential and commercial centers, and the Young ordinance dispersed adult establishments to diffuse their secondary effects. Neither ordinance stifled or significantly burdened the availability of adult entertainment. The Court noted in Young, "The situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech. Here, however, . . . '[the] burden on First Amendment rights is slight.'" Young, 427 U.S. at 71 n.35 (citation omitted).

Applying Renton and Young to a Chicago zoning ordinance that limited the location of "adult uses," we explained that a content-discriminatory regulation of time, place or manner is constitutional only if it preserves "'reasonable opportunity' to disseminate the speech at issue." North Avenue Novelties, 88 F.3d at 445. The key inquiry focuses upon "the ability of producers as a group to provide sexually explicit expression, as well as on the ability of the public as a whole to receive it." Id. at 444. We upheld the Chicago ordinance because it "does not prohibit sexually explicit expression, but merely requires that such expression take place only in specified areas, and only in a non-concentrated manner." Id.; see also Matney, 86 F.3d at 698 (upholding an open-booth requirement for adult-entertainment viewing booths because it in no sense purported to ban or even limit adult entertainment); Berg, 865 F.2d at 802 (same). Thus, only the provisions of the Ordinance that regulate the time, place or manner of adult entertainment without removing alternative channels of communication are reasonable under the First Amendment.

Under this standard, we uphold the Section X limitations on the hours of operation for sexually oriented businesses. Section X is a classic time, place or manner restriction, limiting the business hours for sexually oriented businesses to between 10 a.m. and midnight, Monday through Saturday. In DiMa, we found an ordinance that restricted the operating hours of adult-oriented establishments to be content-based, but analyzed and upheld it under content-neutral analysis consistent with Renton and Young. DiMa, 185 F.3d at 831; see also Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358, 1365 (11th Cir. 1999); Richland Bookmart, 137 F.3d at 439-41; Mitchell v. Commission on

Adult Entertainment Establishments, 10 F.3d 123 (3d Cir. 1993). Combating harmful secondary effects of adult entertainment is a significant government interest unrelated to speech content, and Cumberland satisfactorily established a secondary-effects justification for its time, place or manner regulation. See DiMa, 185 F.3d at 830. Whereas the municipality in DiMa did nothing more than cite the experiences of another Wisconsin town, Cumberland collected and reviewed a host of studies on secondary effects and the need for constrained operating hours. Cumberland's legislative research indicated that the hours-of-operation constraint enabled local law enforcement to concentrate its limited resources for those business hours. Although Section X provides fewer hours of operation than the ordinance in DiMa, we find that the restriction is not "substantially broader than necessary," even if more restrictive than absolutely necessary or justified. Ward, 491 U.S. at 800.

Section VIII(A) presents a more difficult question. Section VIII(A) proscribes "appear[ing] in a state of nudity or depict[ing] specified sexual activities" in a sexually oriented business. Cumberland bases Section VIII(A) on the significant government interest in fighting injurious secondary effects and justifies it by citing the history of crime at the Island Bar and research on secondary effects from studies and other cases. Section VIII(A) is cleverly styled as a mere time, place or manner restriction because it forbids certain expressive activity only within sexually oriented businesses but not elsewhere. Yet the operation of Section VIII(A) is clear. In practice, it effectively bans commercial nude dancing. Section II of the Ordinance defines a sexually oriented business as one that regularly features live performances characterized by the exposure of specified anatomical areas or specified sexual activities. But such performances by Ordinance definition always contain nudity (by virtue of exposed specified anatomical areas) or depictions of specified sexual activities, both of which Section VIII(A) bans within those sexually oriented establishments. Thus, Section II defines sexually oriented businesses with reference to the presentation of live adult entertainment, then Section VIII(A) stifles that presentation by forbidding nudity and sexual depictions within those sexually oriented businesses. To wit, the Island Bar is a sexually oriented business because it presents nudity, and as a result, the Ordinance bans nudity within the Island Bar, the sole supplier of nude dancing in Cumberland. Paradoxically, only by refraining from protected speech can a venue, its operator and its

performers avoid the Section VIII(A) restrictions. For this reason, Section VIII(A) is not a mere time, place or manner restriction.

Nonetheless, the Supreme Court held in Erie and Barnes that limiting erotic dancing to semi-nudity represents a de minimis restriction that does not unconstitutionally abridge expression. Erie, 120 S.Ct. at 1397; Barnes, 501 U.S. at 571. As the Court explained in Barnes, "the requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic." Barnes, 501 U.S. at 571. Similarly in Erie, the Court reiterated that "[t]he requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message." Erie, 120 S.Ct. at 1397. Insofar as it prohibits full nudity and requires dancers to wear pasties and G-strings while performing, Section VIII(A) does not offend the First Amendment. Cf. Dodger's Bar & Grill, Inc. v. Johnson County Bd. of County Comm'rs, 52 F.3d 1436, 1443 (10th Cir. 1994) (upholding similar nudity restrictions under the Twenty-First Amendment). The Ordinance, however, goes several steps further. Section VIII(A) outlaws the performance of a strikingly wide array of sexually explicit dance movements, or what the Ordinance misdenominates as "specified sexual activities," including "the fondling or erotic touching of human genitals, pubic region, buttocks, anus, or female breasts."

By restricting the particular movements and gestures of the erotic dancer, in addition to prohibiting full nudity, Section VIII(A) of the Ordinance unconstitutionally burdens protected expression. The dominant theme of nude dance is "an emotional one; it is one of eroticism and sensuality." Miller, 904 F.2d at 1086-87. Section VIII(A) deprives the performer of a repertoire of expressive elements with which to craft an erotic, sensual performance and thereby interferes substantially with the dancer's ability to communicate her erotic message. It interdicts the two key tools of expression in this context that imbue erotic dance with its sexual and erotic character--sexually explicit dance movements and nudity. Unlike a simple prohibition on full nudity, Section VIII(A) does much more than inhibit "that portion of the expression that occurs when the last stitch is dropped." Erie, 120 S.Ct. at 1393. Section VIII(A) constrains the precise movements that the dancer can express while performing. The dancer may use non-sexually explicit elements and semi-nudity to convey a certain degree of sensuality,

but putting taste aside, more explicit and erotic content is commonly available on primetime television without being fairly regarded as adult entertainment. The Court has declared that the government cannot "ban all adult theaters--much less all live entertainment or all nude dancing." Schad, 452 U.S. at 71. We ourselves explained in DiMa, "Because this speech is not obscene, government may not simply proscribe it." DiMa, 185 F.3d at 827. Cumberland cannot avoid this dictate by regulating nude dancing with such stringent restrictions that the dance no longer conveys eroticism nor resembles adult entertainment. The portion of Section VIII(A) that bars the "depiction of specified sexual activities" is unconstitutional because it prevents erotic dancers from practicing their protected form of expression.

None of the Supreme Court's precedent permits a government regulation expressly directed at adult entertainment and imposing such a restriction on non-obscene adult entertainment. Analyzed under strict scrutiny, as befits a content-based regulation, this portion of Section VIII(A) violates the First Amendment. To survive strict scrutiny, the provision must be necessary to serve a compelling state interest and be narrowly drawn to achieve that end. See Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd., 502 U.S. 105, 118 (1991). This provision fails because it is not necessary to serve Cumberland's significant interest in arresting secondary effects. Cumberland can employ a variety of less speech-restrictive and more direct means to fight prostitution, illicit sex, sexually transmitted disease and urban blight. See Leverett v. City of Pinellas Park, 775 F.2d 1536, 1540 (11th Cir. 1985). We uphold the portion of Section VIII(A) that bans full nudity within sexually oriented businesses but strike the portion of Section VIII(A) that bans the performance of specified sexually explicit movements within sexually oriented businesses.

B. Section VIII(A) and Overbreadth

Having found part of Section VIII(A) to be a constitutional time, place or manner restriction, we now reach the plaintiffs' claim that Section VIII(A) is overbroad. The overbreadth doctrine prevents the government from casting a net so wide that its regulation impermissibly burdens speech. To avoid chilling the speech of third parties who may be unwilling or unlikely to raise a challenge in their own stead, the overbreadth doctrine in certain circumstances permits litigants already before the court to challenge a regulation on its face and raise the rights of third parties whose protected expression is

prohibited or substantially burdened by the regulation. See Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973). A facial overbreadth challenge is successful when it establishes "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984). The Supreme Court has cautioned that overbreadth is "manifestly, strong medicine," Broadrick, 413 U.S. at 613, and has invalidated regulations only when a limiting construction is not readily available and the unconstitutional applications of the regulation are real and substantial in relation to the regulation's plainly legitimate sweep. See, e.g., Forsyth County v. Nationalist Movement, 505 U.S. 123 (1992); Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569 (1987); Brockett v. Spokane Arcades, 472 U.S. 491 (1985); Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620 (1980).

Cumberland claims that Barnes and Erie shield the Ordinance from an overbreadth challenge, but the Supreme Court did not reach the issue of overbreadth in either case. In Barnes, a state court decision provided a limiting construction that saved the public-nudity statute from overbreadth. Barnes, 501 U.S. at 565 n.1. However, speaking for the Court, Justice Souter questioned skeptically whether the secondary-effects rationale from that case would protect against an overbreadth challenge if the statute "bar[red] expressive nudity in classes of productions that could not readily be analogized to the adult films at issue in Renton." Barnes, 501 U.S. at 585 n.2 (Souter, J., concurring). He doubted that the statute could be applied to "a production of 'Hair' or 'Equus' . . . in the absence of evidence that expressive nudity outside the context of Renton-type adult entertainment was correlated with such secondary effects." Id. In Erie, the Court again did not reach the overbreadth question presented by the parties. The Court simply reversed the Pennsylvania Supreme Court on other grounds and remanded without addressing overbreadth. See Erie, 120 S.Ct. at 1398, see also Erie, 120 S.Ct. at 1406 n.5 (Souter, J., dissenting in part) (noting that the lower court on remand could dispose of the case on overbreadth grounds, which the Court did not address). Thus, Barnes and Erie are unhelpful with respect to overbreadth.

We already have found that the Section VIII(A) ban on full nudity is a permissible restriction of erotic dancing at the Island Bar, but the plaintiffs argue on behalf of third parties who wish to engage in protected speech yet are

deterred by what the plaintiffs regard as the Ordinance's real and substantial threat of overbreadth. In this context, the overbreadth doctrine guards against the suppression of protected speech unconnected to the negative secondary effects cited as legislative justification. See Tunick v. Safir, 209 F.3d 67, 83 (2d Cir. 2000); Triplett Grille, Inc. v. City of Akron, 40 F.3d 129, 135 (6th Cir. 1994). When the government restricts speech not associated with harmful secondary effects, then the government cannot be fairly said to be regulating with those secondary effects in mind and the regulation extends beyond its legitimate reach. Cumberland has made no finding of harmful secondary effects resulting from venues outside of adult entertainment, so the overbreadth doctrine would invalidate Section VIII(A) if it stifles substantial expressive conduct unassociated with the pernicious secondary effects advanced as the Ordinance's purpose. The plaintiffs argue that Section VIII(A) unconstitutionally forbids the regular showing of live performances featuring live nudity or depiction of sexual activity, but which sit outside the domain of adult entertainment and are uncorrelated with harmful secondary effects. Specifically, the plaintiffs explain that the definitions for adult theater and adult cabaret would cover venues that present theatrical and artistic performances which feature nudity or sexual content, but also contain serious artistic, social or political value.

The plain language of the Ordinance determines whether Section VIII(A) is overbroad. The Section II definitions for adult theater and adult cabaret cover a commercial establishment that "regularly features . . . persons who appear in a state of nudity or semi-nude." This definition lends itself to expansive interpretation. "Regularly" means "in a regular, orderly, lawful, or methodical way," and "regular" means "returning, recurring or received at stated, fixed or uniform intervals <in the [regular] course of events>." Webster's, at 1913. "Features" means "to give special prominence to . . . <the theater was featuring a murder-mystery film>." Id. at 832. The definition for adult theater and adult cabaret might include within the Ordinance's province any venue that presents at orderly intervals, as a matter of normal course, performances that prominently include nudity or semi-nudity. So construed, this definition would include a theater or playhouse that shows on a regular basis an interpretation of Hair, a presentation characterized by much nudity but which the Court has indicated constitutes protected speech. See Barnes, 501 U.S. at 585 n.2 (Souter, J., concurring);

Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 558 (1975). The text does not limit its regulation to adult entertainment because an array of "regularly feature[d]" artistic and theatrical expression includes live nudity or semi-nudity without necessarily becoming content readily analogous to the adult entertainment regulated in Renton and Young. Unlike statutes upheld against overbreadth challenges in other cases, the Ordinance contains no explicit exception for expression that contains nudity or sexual depiction but also possesses serious artistic, social or political value. See, e.g., Tunick, 209 F.3d at 71 (exception for "performances or exhibitions that [take] place indoors before audiences"); J&B Entertainment, Inc. v. City of Jackson, 152 F.3d 362, 365 (5th Cir. 1998) (exception for persons "engaged in expressing a matter of serious literary, artistic, scientific or political value"); Farkas v. Miller, 151 F.3d 900, 905 (8th Cir. 1998) (exception for venues "primarily devoted to the arts or theatrical performances"). Nor has the Ordinance been narrowed by state courts, as was the statute in Barnes, to exclude protected expression.

Nonetheless, a facial overbreadth challenge fails when the regulation's plain language is readily susceptible to a narrowing construction that would make it constitutional. See American Booksellers, 484 U.S. at 397. "Regularly features" lends itself to the definition described above--giving special prominence at uniform, orderly intervals as a matter of normal course. However, the Ordinance does not specify how long a venue must regularly feature such content before it qualifies as a sexually oriented business. For example, a local theater might offer nightly showings of Hair for only a month, and it is unclear whether this regularity suffices to qualify the theater as an adult theater or cabaret. The local theater probably would not resemble an adult-entertainment establishment in the sense contemplated by Renton and Young, provided that it also regularly showcased other plays and performances, not all of which contain nudity, semi-nudity or sexual content. In this context, a narrowing construction that comports with the Ordinance's express intent is readily available: giving special prominence at uniform, orderly intervals on a permanent basis. "Regularly features" can be interpreted to mean "always features." Under this interpretation, a venue falls within the definitions for adult theater and adult cabaret only if it features nudity, semi-nudity or specified sexual content as the permanent focus of its business and gives special prominence to such content on a permanent basis./4 This

construction limits the Ordinance to adult-entertainment establishments, which always feature nudity, semi-nudity and specified sexual content, and excludes theatrical venues that present shows like Hair or Equus for long stretches but not on a permanent basis. It is conceivable, though unlikely, that a theater might make the presentation of artistic performances featuring nudity its abiding focus. But even so, the Ordinance's unconstitutional applications would not be real and substantial in relation to its plainly legitimate sweep. See Brockett, 472 U.S. at 503. At worst, the Ordinance might require theatrical dancers to don pasties and G-strings while performing, and those performers can bring as-applied challenges to the Ordinance at that time, assuming Cumberland enforces it against them. In a facial challenge like this one, there must be a realistic danger that the Ordinance will significantly compromise the First Amendment rights of parties not before the Court. See Taxpayers for Vincent, 466 U.S. at 801. The plaintiffs suggest scenarios to which the Ordinance might apply on its face and would unconstitutionally restrict protected expression, but the Ordinance is readily susceptible to a narrowing construction that saves the potentially unconstitutional applications from dwarfing the Ordinance's legitimate reach. We reject the plaintiffs' overbreadth claims and reverse the district court's grant of summary judgment in the plaintiffs' favor on those claims.

C.  Licensing Provisions

The plaintiffs argue that Sections XI and XIII impose prior restraints on expression, in the form of licensing, disclosure and qualification requirements, that are not narrowly tailored to Cumberland's significant government interests in stemming detrimental secondary effects. The plaintiffs do not challenge the procedural adequacy of the licensing schemes contained in Sections XI and XIII of the Ordinance. See, e.g., FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 228 (1990) (requiring constrained discretion by the licensor, a limited time frame within which the licensor must decide and opportunity for prompt judicial review).

Any system of prior restraint comes "bearing a heavy presumption against its constitutional validity." Southeastern Promotions, 420 U.S. at 558 (quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963)). The proponent of a prior restraint "'carries a heavy burden of showing justification for the imposition of such a restraint.'" New York Times Co. v. United States, 403 U.S. 713, 714 (1971) (quoting Organization for a Better Austin v. Keefe, 402 U.S. 415, 419

(1971)). However, prior restraints are not per se unconstitutional because "the state may sometimes curtail speech when necessary to advance a significant and legitimate state interest." Taxpayers for Vincent, 466 U.S. at 804. Indeed, we already have decided that a licensing requirement for adult-entertainment establishments is not unconstitutional per se as a prior restraint, if it otherwise conforms to the constitutional requirements of Young. See Genusa v. City of Peoria, 619 F.2d 1203, 1213 (7th Cir. 1980).

Licensing, though functioning as a prior restraint, is constitutionally legitimate when it complies with the standard for time, place or manner requirements. See, e.g., Cox v. New Hampshire, 312 U.S. 569, 575-76 (1941). Time, place or manner restrictions that regulate the conditions under which expression may take place are permissible so long as the regulation is narrowly tailored to serve a significant government interest unrelated to the suppression of free expression and leaves alternative channels for communication. See DiMa, 185 F.3d at 828. In Genusa v. City of Peoria, we held that a city government could require municipal licensing for adult bookstores based on a secondary-effects rationale from Young. Genusa, 619 F.2d at 1215. We upheld required disclosure of certain information, such as the license applicant's name, address and proposed place of business, because this information was "legitimately related to the state interest that underlies the zoning provisions." Id. at 1216; see also TK's Video, Inc. v. Denton County, 24 F.3d 705, 710 (5th Cir. 1994) (requiring a "relevant correlation" or "substantial relation" between the information required and the government interest). We also upheld the requirement that licensees openly display their adult-use license because this was rationally related to policing for licensing compliance and had "no discernible impact on protected freedoms." Genusa, 619 F.2d at 1221.

Similarly here, we uphold the Ordinance inspection requirements and certain portions of Section XI requiring applicant disclosures. Section V of the Ordinance imposes interior-configuration requirements, which the plaintiffs appear not to challenge and analogs of which we have approved before as reasonable time, place or manner regulations. See Matney, 86 F.3d 698; Berg, 865 F.2d at 803. Section XIII(C)(6) forbids licensing when the premises of the business have not been approved as in compliance with applicable laws and ordinances, including those configuration requirements. This provision enables the city to enforce compliance with the

special health and safety requirements for sexually oriented businesses. To the degree that the Ordinance requires compliance with other extant health and safety laws applicable to all Cumberland businesses, Section XIII(C)(6) is redundant and constitutionally inoffensive. Cf. Arcara, 478 U.S. at 707 (permitting closure of an adult bookstore for violating health laws applicable to all businesses). In contrast to the City of Peoria in Genusa, Cumberland collected an adequate body of research to justify its interior-configuration requirements and substantiate a connection between these regulatory requirements and the city's legitimate interest in arresting secondary effects.

We also uphold the Section XI required disclosures of the following: the applicant's name; proof of the applicant's age; the type of license for which the applicant is applying; the proposed location, address and descriptions of the business premises; identifying personal data. All this information allows Cumberland to regulate the time, place or manner of adult entertainment without censoring expression. This data enables Cumberland to administer licenses and monitor compliance with its zoning requirements, which the plaintiffs do not challenge. Likewise, requiring proof of employee age legitimately relates to the government's interest in preventing underage performers from engaging in adult entertainment. In addition, we uphold the Ordinance requirement of a revenue-neutral license application fee to defray the costs of administration. See Genusa, 619 F.2d at 1213./5 Yet we invalidate the required production of a residential address, recent color photograph, Social Security number, fingerprints, tax-identification number and driver's license information. This information is redundant and unnecessary for Cumberland's stated purposes. Its required disclosure serves "no purpose other than harassment," Genusa, 619 F.2d at 1217, because it is not narrowly tailored to the government's interests in the time, place or manner of adult entertainment.

The First Amendment also does not allow licensing provisions based on criminal history that "totally prohibit certain classes of persons" from First Amendment expression. Genusa, 619 F.2d at 1218. We struck provisions of the Peoria licensing scheme in Genusa that disqualified applicants who previously had a liquor-license revocation, felony conviction or a specified sex-related conviction. Id. at 1218. These provisions were absolute prohibitions on speech, and the city failed to demonstrate that its goals "[could not] be effectuated by means that impact less drastically on protected

freedoms." Id. at 1219. The disqualification provisions were content-based prohibitions of expression that do not fall within Barnes and Erie and fail to provide alternative channels for communication under Renton and Young. As we explained in Genusa, "We know of no doctrine that permits the state to deny to a person First Amendment liberties other than the right to vote solely because that person was once convicted of a crime or other offense." Genusa, 619 F.2d at 1219 n.40.

Accordingly, the Ordinance disqualification provisions in Section XIII for operator and employee licensing are unconstitutional as well. Sections XIII(A)(3) and (C)(5) disqualify any applicant who has been convicted of a "specified criminal activity," defined as any of the vice offenses listed in Section II(23)./6 Sections XIII(A)(5) and (C)(4) disqualify any applicant who recently had been denied or revoked a license by the city. Section XIII(C)(2) disqualifies any applicant who is overdue in payment of city taxes, fees, fines, or penalties in relation to any business. Like the disqualification provisions struck as unconstitutional in Genusa, these license ineligibility provisions absolutely disentitle classes of speakers from a category of expression. They produce a complete ban on certain expression for a disqualified group of applicants who, by definition, wish to speak, and such a drastic measure cannot be justified here as narrowly tailored to resist noisome secondary effects. Indeed, Cumberland neither conducted nor cited any study establishing its basic premise that ownership or performance by those convicted of specified criminal activity or misconduct is more likely to lead to secondary effects than ownership or performance by anyone else.

The government may regulate the conditions under which operators and performers may stage adult entertainment, and in accordance, it may withhold or revoke a license pending compliance with legitimate time, place or manner requirements. Yet the government may not categorically disenfranchise a class from protected expression in this licensing context, at least on the factual record Cumberland has compiled, because it thereby fails to provide the alternative channels for communication required by Renton and Young for those speakers. Consequently, the Section XI(E)(3)-(5) required disclosures of the applicant's criminal and past licensing histories are unnecessary because, absent any disqualification ground on those bases, such disclosures are unjustified by a government interest here.

D.  Severability

  The severability clause in Section XXII of the Ordinance provides that "[i]n the event that any section, subsection, clause, phrase or portion of this ordinance is for any reason held illegal, invalid or unconstitutional . . . such holding shall not affect the validity of the remainder of this ordinance." However, the severability clause can save the constitutionally viable remainder only if the invalidated elements were not "an integral part of the statutory enactment viewed in its entirety." Zbaraz v. Hartigan, 763 F.2d 1532, 1545 (7th Cir. 1985) (internal quotation and citation omitted). We have found unconstitutional as they apply to adult theaters and adult cabarets, the Section VIII(A) ban on certain sexually explicit movements, several Section XI disclosure requirements and all the Section XIII licensing disqualification provisions. This leaves several discrete sections that stand on their own: the Section VIII(A) ban on nudity within sexually oriented businesses, the Section X hours-of-operation provision and a licensing system that requires disclosure of applicant age and business data relating to the time, place or manner of the sexually oriented business's operation. In deference to the Ordinance's robust severability clause, we think that the unconstitutional provisions of the Ordinance may be severed workably from the rest. We therefore permanently enjoin only the stricken sections and permit the operation of those sections either upheld or unchallenged.

III.  Conclusion

  For the foregoing reasons, the following provisions of the Ordinance violate the First Amendment: the Section VIII(A) ban on sexually explicit movements within sexually oriented businesses; Section XI(C) (fingerprinting requirement); Section XI(E)(3)-(5), (8)-(10), Section XI(F)(3)-(4), (6)-(7), and Section XI(G) (certain disclosure requirements); Section XIII(A)(3), (5) and Section XIII(C)(2), (4)-(5) (certain disqualification provisions); and Section XIII(B) (ineligibility for license renewal on the basis of specified criminal activity). The following provisions of the Ordinance are constitutional and severed from the invalidated provisions: the Section VIII(A) prohibition on nudity within sexually oriented businesses; and the remaining licensing provisions in Sections XI and XIII. We offer no opinion regarding other provisions of the Ordinance that the plaintiffs did not challenge. We Affirm in part and Reverse in part the judgment of the district court.

/1 Section XIII provides in pertinent part:

(A)  Upon the filing of said application for a sexually oriented business employee license, the city shall issue a temporary license to said applicant. The application shall then be referred to the appropriate city departments for an investigation to be made on such information as is contained on the application. The application process shall be completed within thirty (30) days from the date the completed application is filed. After the investigation, the City shall issue a license, unless it is determined by a preponderance of the evidence that one or more of the following findings is true:

(1)  The applicant has failed to provide information reasonably necessary for issuance of the license or has falsely answered a question or request for information on the application form;

(2)  The applicant is under the age of eighteen (18) years;

(3)  The applicant has been convicted of a "specified criminal activity" as defined in this ordinance;

(4)  The sexually oriented business employee license is to be used for employment in a business prohibited by local or state law, statute, rule or regulation, or prohibited by a particular provision of this ordinance; or

(5)  The applicant has had a sexually oriented business employee license revoked by the City within two (2) years of the date of the current application. If the sexually oriented business employee license is denied, the temporary license previously issued is immediately deemed null and void. . . .

(B)  A license granted pursuant to this section shall be subject to annual renewal upon the written application of the applicant and a finding by the City that the applicant has not been convicted of any specified criminal activity as defined in the ordinance or committed any act during the existence of the previous license which would be grounds to deny the initial license application. The renewal of the license shall be subject to the payment of the fee as set forth in Section XIV.

(C)  Within 30 days after receipt of a completed sexually oriented business application, the City shall approve or deny the issuance of a license to an applicant. The City shall approve the issuance of a license to an applicant unless it is determined by a preponderance of the evidence

that one or more of the following findings is true:

(1)   An applicant is under eighteen (18) years of age.

(2)   An applicant or a person with whom applicant is residing is overdue in payment to the City of taxes, fees, fines, or penalties assessed against or imposed upon him/her in relation to any business.

(3)   An applicant has failed to provide information reasonably necessary for issuance of the license or has falsely answered a question or request for information on the application form.

(4)   An applicant or a person with whom the applicant is residing has been denied a license by the City to operate a sexually oriented business within the preceding twelve (12) months or whose license to operate a sexually oriented business has been revoked within the preceding twelve (12) months.

(5)   An applicant or a person with whom the applicant is residing has been convicted of a specified criminal activity defined in this ordinance.

(6)   The premises to be used for the sexually oriented business have not been approved by the health department, fire department, and the building officials as being in compliance with applicable laws and ordinances.

(7)   The license fee required by this ordinance has not been paid.

(8)   An applicant of the proposed establishment is in violation of or is not in compliance with any of the provisions of this ordinance.

/2 A divided Court issued four separate opinions in Barnes, but under Marks v. United States, 430 U.S. 188, 193 (1977), Justice Souter's concurrence is the controlling opinion on this issue, as the most narrow opinion joining the judgment of the Court. See DiMa Corp. v. Town of Hallie, 185 F.3d 823, 830 (7th Cir. 1999); see also Tunick v. Safir, 209 F.3d 67, 83 (2d Cir. 2000) (collecting cases in agreement from other circuits).

/3 The definition for "adult cabaret" has an additional clause that again refers to content. This prong of the definition apprehends within its ambit a commercial establishment that "regularly features films, motion pictures, video cassettes, slides or other photographic

reproductions which are characterized by the depiction or description of 'specified sexual activities' or 'specified anatomical areas.'"

The definitions of "nudity," "semi-nude," "specified anatomical areas" and "specified sexual activities" are uncontroversial, and the parties do not contend otherwise.

/4 In practice, the Ordinance defines adult cabaret and adult theater as establishments that regularly feature semi-nudity or depictions of specified sexual activities. Under the Ordinance, it is legally impossible to feature nudity regularly. Any establishment that regularly features full nudity qualifies as a sexually oriented business under the Ordinance. As a sexually oriented business, the venue is then prohibited by Section VIII(A) from presenting nudity even once. At that point, the venue could not be characterized as regularly featuring nudity and thus would no longer be classified as a sexually oriented business. As such, it would be free to show nudity so long as it did not again "regularly feature" it. The point is that the Section VIII(A) prohibition on nudity in establishments that regularly feature nudity is a legal nullity unless Cumberland or courts define a time period during which the venue will be classified as a sexually oriented business, by virtue of its regular featuring of nudity in the past, even after Section VIII(A) prevents further presentation of nudity within.

/5 Section XI(3)-(5) requires disclosure of information relating to the applicant's cohabitants, and Section XIII(C)(2) and XIII(C)(4)-(5) disqualify applicants based on that information. The plaintiffs do not challenge these provisions on appeal, and the district court correctly held that they lack third-party standing to challenge these provisions on behalf of their cohabitants. See Schultz, 26 F.Supp. at 1149 n.2. Similarly, the plaintiffs do not have standing to challenge Ordinance provisions relating to corporate shareholders because the Island Bar is a sole proprietorship.

/6 Section II(23)(a) defines "specified criminal activity" as

prostitution or promotion of prostitution; dissemination of obscenity; sale, distribution or display of harmful material to a minor; sexual performance by a child; possession or distribution of child pornography; public lewdness; indecent exposure; indecency with a child; engaging in organized criminal activity; sexual assault; molestation of a child; gambling; or distribution of a controlled substance; or any

similar offenses to those described above under the criminal or penal code of other states or countries.